UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
BRENDAN MacWADE, ANDREW
SCHONEBAUM, JOSEPH GEHRING, JR.,
PARTHA BANERJEE, and NORMAN
MURPHY,

                  Plaintiffs,

  vs.

RAYMOND KELLY, Commissioner of the New
York City Police Department; and THE CITY
OF NEW YORK.

                  Defendants.
----------------------------------------------------------------x

Judge Berman

**COMPLAINT**

05 Civ.



## PRELIMINARY STATEMENT

1.     This lawsuit challenges a program, unprecedented in this country, under which millions of innocent New Yorkers are subject to suspicionless searches by the police. The New York City Police Department has adopted and is enforcing a criminal, law-enforcement policy and practice of searching the possessions of those seeking to enter the New York City subway system without any suspicion of wrongdoing whatsoever. Since the subway search policy was put into effect on July 21, 2005, police officers have searched the purses, handbags, briefcases, and backpacks of thousands and perhaps tens of thousands of people, all without suspicion of wrongdoing. On July 27, the NYPD announced it would continue its subway search program indefinitely.

2.     Under the subway search program as the Police Department has implemented it, the

1

NYPD is not conducting searches at most subway entrances at any given time, is giving advance notice about searches at those entrances where searches are being conducted, is allowing people selected for a search to walk away, and is not basing the searches on any suspicious activity of individuals. Consequently, as common sense would suggest, the NYPD's subway search program is virtually certain neither to catch any person trying to carry explosives into the subway system nor to deter such an effort. Indeed, given the way the Department has implemented its search program, the only people being searched are innocent users of the subway system.

3. Though the NYPD's written subway search guidelines indicate that riders are to be selected for search in a nondiscretionary manner by using a numerical formula (e.g. one in every five or ten people with bags), the volume of people entering subway stations and the lack of NYPD control over that volume result in many people being selected for search in a discretionary and arbitrary manner, which creates the potential for impermissible racial profiling.

4. The plaintiffs are law-abiding New Yorkers who ride the New York City subway system daily and who routinely carry into the system bags containing personal items and private materials. All of the plaintiffs are subject to potential search under the NYPD search policy, and some already have been searched by police officers. All of the plaintiffs object to the police searching their personal possessions as a condition of entering the subway.

5. The constitutional right of people not suspected of any wrongdoing to be free from police searches is one of the most fundamental protections of our free society. While concerns about

terrorism of course justify -- indeed, require -- aggressive police tactics, those concerns cannot justify the Police Department's unprecedented policy of subjecting millions of innocent people to suspicionless searches in a way that is virtually certain not to identify any person seeking to engage in terrorist activity and will not have any meaningful deterrent effect. Under our constitutional regime, the Department has many tools and strategies available to it to respond to legitimate concerns about terrorism, and the plaintiffs have no objection to the Department conducting appropriate searches.

6.      The NYPD's policy and practice of widespread, suspicionless searches of people seeking to use the New York City subway system violates the Fourth and Fourteenth Amendments of the United States Constitution. The plaintiffs seek a declaratory judgment and preliminary and permanent injunctive relief against further enforcement of the policy.

## JURISDICTION AND VENUE

7.      This court has subject-matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(3-4).

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b) in that plaintiffs' claims arise in the Southern District of New York.

9.      Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201, 2202. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

10. Plaintiff BRENDAN MacWADE is a resident of Brooklyn, New York.

11. Plaintiff ANDREW SCHONEBAUM is a resident of Queens, New York.

12. Plaintiff JOSEPH GEHRING, JR. is a resident of Manhattan.

13. Plaintiff PARTHA BANERJEE is a resident of Brooklyn, New York.

14. Plaintiff NORMAN MURPHY is a resident of Mahwah, New Jersey.

15. Defendant the CITY OF NEW YORK is a municipal corporation within the State of New York.

16. Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department, which has its headquarters at 1 Police Plaza in Manhattan. According to published reports, Commissioner Kelly personally made the decision to implement the NYPD's subway search policy. He is sued in his official capacity for injunctive relief.

## FACTS

17. The New York City subway system is used by millions of people, with daily rides

reaching nearly 5 million during the work week. In a city in which many people do not own cars but must travel considerable distances each day, the subway is an essential part of their lives. Millions of people need the system to get to and from work, to visit family and friends, or simply to move about the city.

18. Many of those relying on the subway each day carry with them into the system purses, handbags, briefcases, bookbags, gym bags, luggage, and backpacks, many of which contain personal items in which riders have a substantial, legitimate, and important expectation of privacy.

19. On July 21, 2005, several hours after an attempted terrorist attack on the London subway system, New York City Mayor Michael Bloomberg and New York City Police Department Commissioner Raymond Kelly announced that the NYPD would start conducting "random" searches of persons seeking to enter the New York City subway system.

20. At the press conference at which city officials announced the subway search policy, Mayor Michael Bloomberg stated that the search policy was not in response any specific threat against the city.

21. Upon information and belief, Commissioner Kelly made the decision to institute the subway search program without consulting with the Metropolitan Transportation Authority, which operates the subway system.

22.     Since July 21, 2005, NYPD officers have searched the possessions of thousands, if not tens of thousands, of people seeking to ride the subway in stations across the City. Upon information and belief, searches have taken place at most of the 468 subway stations in the New York City subway system.

23.     Police officers are not limiting themselves to searches. According to a July 23 report in the New York Times, police officers at a Jamaica, Queens subway station required subway riders who were searched to produce identification; though these people were not accused of any wrongdoing, the officers recorded their personal information in writing. According to the same story, officers at a subway stop at 42nd Street and Eighth Avenue in Manhattan "briefly rifled through papers and notebooks" found in purses or backpacks.

24.     Under the NYPD's policy and practice, subway riders are being selected for search without suspicion that the person has engaged in or will engage in any wrongdoing.

25.     In conducting its searches, NYPD officers have searched bags large and small, ranging from small purses to large backpacks.

26.     At any given time, searches are taking place at a small number of entrances to the 468 stations in the New York City subway system. When searches are taking place at some subway stations, many if not most of the system's other stations are available for entry without any searching taking place. And even at the stations where searches are taking place, they are not

6

always taking place at all entrances to the station, leaving people free to enter that same station without risk of being selected for search.

27. At those subway entrances where they are conducting searches, NYPD officers are not searching the possessions of every person seeking to enter. Instead, according to a directive provided to members of the Department, officers are to search people by some sort of numerical formula (for instance, one out every ten people with a bag).

28. Given the volume of people entering New York City subway stations and the lack of any meaningful control over the flow of people entering stations and approaching NYPD checkpoints, many subway riders are not being selecting for search according to any numerical formula. Rather, many are being selected for search in a discretionary and arbitrary manner, which in turn creates the potential for impermissible racial profiling.

29. Upon information and belief, at stations where searches are being conducted, the NYPD has posted notices alerting the public that searches are taking place at that station. The Department's policy also provides that people selected for search are free to walk away, and upon information and belief, officers are allowing people to do this.

30. As a result of the fact that people are given advance notice of searches at a particular subway entrance and are permitted to walk away if selected for a search, the search program instituted by the Police Department is virtually certain not to catch anyone seeking to bring a

bomb into the system. Rather, the only people being searched are people who present no threat of bringing explosives into the subway system.

31.     As a result of the fact that the Police Department is conducting random searches at only a small number of entrances to the subway system, terrorists are free to enter the system without fear of being subjected to a search.

32.     According to published reports, the Police Department will arrest any person who is searched and who, as a result of the search, a police officer learns may have committed a crime.

33.     The plaintiffs all use the subway on a daily basis, carry bags with them, and are subject to the Police Department's subway search policy. Some already have been searched and one has been selected for search and walked away. All of the plaintiffs are law-abiding and object to having the police search their possessions.

34.     Plaintiff Brendan MacWade is a 32-year-old, law-abiding resident of Brooklyn who was working on the 40th Floor of Tower One of the World Trade Center when the terrorist attack occurred on September 11, 2001. Each work day he must use the subway to get to work in New Jersey. He rides either the R train to the World Trade Center, or the M train to Broad Street, where he then walks to the PATH train to go to Jersey City, New Jersey. He often carries a bag with him, and on the evening of July 22 he was selected for search and had his bag searched by NYPD officers at the Chambers Street station of A/C/E subway lines. He was offended by the

search and felt that his rights had been violated.

35.     Plaintiff Andrew Schonebaum is a law-abiding resident of Queens who commutes daily to his job on the E subway line between the Roosevelt Avenue station in Queens and stations in midtown Manhattan.  On the morning of Friday, July 22, he was instructed by a police officer at the turnstiles by the main entrance to the Roosevelt Avenue station to go to a table where the bag of another subway passenger was being searched.  The police officer at the table asked him to open his bag, which contained a copy of the Sinclair Lewis book "It Can't Happen Here," and then asked him to open another compartment.  In turn, he complied with both instructions and the officer visually inspected both compartments.  Mr. Schonebaum asked for the officer's name and she gave it to him, asking "Aren't you happy to have your bag searched?"  He replied that he was not because it was a violation of the Fourth Amendment.

36.     Plaintiff Joseph Gehring, Jr., is a life-long Republican, the son of a retired police captain, and a law-abiding resident of the Upper West Side of Manhattan.  As an attorney with offices in midtown Manhattan, he uses the subway system to travel to and from work, to visit clients, and to attend court appearances.  He frequently carries with him a bag containing legal papers as well as personal effects.  He is deeply offended by the prospect of having his bag searched by police officers as a condition of riding the subway system and is concerned that he may be ethically prohibited from allowing police officers to inspect confidential client materials that he often carries.  On July 26 as he was proceeding to court with a briefcase containing client files, Mr. Gehring observed police officers standing outside turnstiles at the Times Square subway station

and, concerned they might attempt to search him, changed his route of travel so as to avoid the possibility of a search. Though he has spent his life comfortably around law-enforcement officials, Mr. Gehring is now extremely anxious when he sees police officers in the subway system.

37.  Plaintiff Partha Banerjee is a law-abiding resident of Brooklyn, was born in India, is a naturalized American citizen, and has a masters degree in journalism from Columbia University and a doctorate in biology from Southern Illinois University. He uses the subway to travel between his home and place of employment, could not get to work without having access to the subway, and regularly carries a backpack into the subway. As a peaceful political activist, writer and media critic who is concerned about the Bush Administration's actions in the name of war on terrorism, Mr. Banerjee often carries in his backpack lawful, written materials he believes police officers may find objectionable. He is fearful that, if he is searched, he might be singled out for mistreatment, including unlawful interrogation and detention, because of the political materials he carries. As someone with brown skin, Mr. Banerjee also is concerned that, with the new fear and paranoia, he is more likely to be singled out by police officers for a search. In September 2003, while seeking to enter a political rally on Wall Street where he was scheduled to speak, Mr. Banerjee had his backpack unlawfully searched by NYPD police officers and was upset by that search.

38.  Norman Murphy is a law-abiding resident of Mahwah, New Jersey. He works in Manhattan and commutes on the Short Line/Coach USA bus line and the subway to and from his

job. On his way home from work on July 22, 2005, he entered the A/C/E Chambers Street subway station. As he approached a turnstile, a police officer asked him if he could look in his bag. Mr. Murphy responded, "Absolutely not." The police officer appeared startled and did not say anything in response. Mr. Murphy left the station and walked a few blocks to a nearby R/W station instead, taking that train uptown to 42nd Street. Mr. Murphy objects to being searched by the police and believes the NYPD's search policy is a serious infringement on civil liberties.

39.  On July 27, the NYPD announced that it would continue its subway search program indefinitely.

40.  The defendants' actions have been taken under color of law.

## CAUSE OF ACTION

41.  The defendants' policy and practice of searching those seeking to use the New York City subway system without any individualized suspicion of wrongdoing violates the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

        WHEREFORE, the plaintiff requests that this court:

(1)  Assume jurisdiction over this matter;

(2)  Issue a declaratory judgment that the defendants' policy and practice of randomly searching those seeking to enter the New York City subway system without individualized suspicion of wrongdoing violates the Fourth and Fourteenth Amendments of the United States Constitution;

(3) Issue a preliminary injunction enjoining the defendants from enforcing their policy and practice of randomly searching those seeking to enter the New York City subway system without individualized suspicion of wrongdoing;

(4) Issue a permanent injunction enjoining the defendants from enforcing their policy and practice of randomly searching those seeking to enter the New York City subway system without individualized suspicion of wrongdoing;

(5) Award the plaintiffs attorneys' fees; and

(6) Grant any other relief the court deems appropriate.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION, by

*[signature]*

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
JEFFREY FOGEL (JF-3948)
DONNA LIEBERMAN (DL-1268)
PALYN HUNG (PH-8007)
125 Broad Street, 17th Floor
New York, N.Y. 10004
(212) 344-3005

Counsel for the Plaintiffs

Dated: August 4, 2005
       New York, N.Y.