**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
BRENDAN MacWADE, ANDREW                    :
SCHONEBAUM, JOSEPH GEHRING, JR.,           :
PARTHA BANERJEE, and NORMAN                :
MURPHY,                                     :
                                            :    **AMENDED DECISION**
                                            :    **AND ORDER**[1]
                        Plaintiffs,         :
            - against -                     :    05 Civ. 6921 (RMB) (FM)
                                            :
RAYMOND KELLY, Commissioner of the New     :
York City Police Department; and THE CITY  :
OF NEW YORK,                                :
                                            :
                        Defendants.         :
------------------------------------------------------------------x

I.      **Introduction**

        New York City's random subway search program, which was begun on July 22, 2005

following terrorist bombings in London's subway system, is constitutional.  The need for

implementing counter-terrorism measures is indisputable, pressing, on-going, and evolving.  The

program adopted by the City of New York and challenged here (the "Container Inspection

Program" or "Program") is not impermissibly intrusive and, according to credible experts

schooled in these matters, it is also effective.[2]  Of course, the use of suspicionless searches

always must be examined carefully, and Plaintiffs have played an important (vigilant) role in this

process.  **Based on the record in this case, including the bench trial conducted on October**

_____

        [1]  This Amended Decision and Order corrects several typographical errors in the
December 2, 2005 Decision and Order.

        [2]  The Court relies principally upon expert testimony in assessing the effectiveness of the
Container Inspection Program.  See United States v. Davis, 270 F.3d 977, 983 (D.C. Cir. 2001)
(holding district court could rely "on nonstatistical evidence or other considerations [such as
expert testimony] in determining whether the checkpoint furthered [its] purpose") (citing United
States v. Martinez-Fuerte, 428 U.S. 543 (1976)).

31 and November 1, 2005, and for the reasons that follow, Plaintiffs' application for a

permanent injunction against Police Commissioner Raymond Kelly and New York City is

denied.

## II.    Background

On August 4, 2005, Brendan MacWade, Andrew Schonebaum, Joseph Gehring, Jr.,

Partha Banerjee, and Norman Murphy (collectively, "Plaintiffs"), represented by the New York

Civil Liberties Union ("NYCLU"), filed a complaint ("Complaint") against Raymond Kelly

("Commissioner Kelly"), Commissioner of the New York City Police Department ("NYPD"),

and the City of New York ("New York City" or "City") (collectively, "Defendants") alleging that

Defendants' "policy and practice of searching those seeking to use the New York City subway

system without any individualized suspicion of wrongdoing violates the Fourth and Fourteenth

Amendments of the United States Constitution and 42 U.S.C. § 1983."  (Complaint ¶ 41.)

Plaintiffs "seek a declaratory judgment and preliminary and permanent injunctive relief against

further enforcement of the policy."  (Id. ¶ 6.)

Soon after filing their Complaint, Plaintiffs sought to obtain certain data and information

by way of discovery from Defendants and, on or about August 12, 2005, Defendants moved for a

protective order to shield from discovery documents and information relating to the frequency

and location of subway searches.  (See Defendants' Memorandum in Support of Application for

Protective Order, dated August 12, 2005, at 3-4 ("The documents at issue fall squarely within"

the law enforcement privilege, and "Plaintiffs cannot demonstrate sufficient need to overcome

the privilege."); Plaintiffs' Memorandum Opposing Motion for Protective Order, dated August

15, 2005, at 1-2 ("defendants fail to explain adequately how disclosure . . . would imperil law

enforcement procedures," and the information sought "is central to the issues in this case").)  On

August 18, 2005, United States Magistrate Judge Frank Maas, to whom discovery issues had

been referred, found that the law enforcement privilege applied to the disputed documents and

information but directed the City to release certain categories of information "for attorneys' eyes

only."  (See Discovery Order, dated August 18, 2005 ("August 18, 2005 Discovery Order"), at 9-

10.)  On August 26, 2005, after receiving objections to the Magistrate Judge's August 18, 2005

Discovery Order from Defendants and a response (including objections) from Plaintiffs and after

reviewing the disputed materials in camera, the Court agreed that the law enforcement privilege

applied but suspended the Magistrate Judge's August 18, 2005 Discovery Order pending an

evidentiary hearing.  (See Decision and Order Staying Further Document Production, dated

August 26, 2005 ("August 26, 2005 Discovery Order"), at 7 ("[G]iven the sensitive nature of the

material sought and Plaintiffs' unproven need for the information, the Court grants Defendants'

motion to shield the disputed documents and information at this time. . . . If at the hearing it

appears that the materials are needed and relevant, Plaintiffs may move to reopen the record . . .

.").)

On August 29, 2005, Plaintiffs voluntarily withdrew their application for a preliminary

injunction and the case proceeded to a bench trial on the merits.  (See Plaintiffs' Letter to the

Court, dated August 29, 2005 ("we are withdrawing our pending request for a preliminary

injunction so we can otherwise obtain the information" about the frequency of subway searches;

Transcript of Proceedings, dated August 30, 3005, at 3 ("in light of [the Court's] ruling . . . we

felt the information we're not going to be getting through discovery, we felt we needed to collect

it on our own. . . . . "[I]t could be done within several weeks."); see also Order, dated August 30,

2005.)[3]

The trial was held on October 31 and November 1, 2005.[4]  During the trial, which

---

[3]  On October 28, 2005, in response to Defendants' motion in limine, the Court ruled that it would accept into the record the data developed by Plaintiffs for purposes of the bench trial, while reserving judgment on its ultimate admissibility.  (See Transcript of Proceedings, dated October 28, 2005, at 4-5 ("I will admit this data and the spread sheet and [the testimony of Maggie Gram, an NYCLU employee who coordinated the collection of the data] for purposes of the hearing but . . . reserve judgment with respect to the motion to exclude ultimately").)  See Nicholls v. Tufenkian Import/Export Ventures, 367 F. Supp. 2d 514, 517 n.1 (S.D.N.Y. 2005).

Similarly, in response to Defendants' motions in limine challenging the expertise of Gene Russianoff and Charles Pena, (see Defendants' Memorandum of Law in Support of their Motion In Limine to Exclude Plaintiffs' Proposed Experts Gene Russianoff and Charles Pena, dated October 21, 2005, at 11 ("Pena was never employed as a systems analyst to analyze terrorist activity or counter-terrorism and has no practical experience involving terrorism or counter-terrorism"), 13 ("the only testimony that Russianoff may be qualified to offer are general facts about the New York City subway system [which] are not in controversy.")), the Court accepted into the record the (opinion) testimony of Gene Russianoff and Charles Pena, while reserving judgment on the admissibility of their testimony as experts. (See Transcript of Proceedings, dated October 28, 2005, at 3 ("I'm going to admit the testimony of both [Russianoff] and Pena for purposes of the trial and the hearing but defer judgment on ruling with respect to the defendants' motion to exclude their testimony.").)  See Nicholls, 367 F. Supp. 2d at 517 n.1.

[4]  In preparation for trial, the parties submitted, among other things, a Joint Pretrial Order, dated October 31, 2005, pretrial memoranda of law, proposed findings of fact and conclusions of law, and direct testimony declarations with exhibits.

 By order, dated November 3, 2005, the Court accepted a pre-trial brief of amici curiae, the Washington Legal Foundation et al., dated October 26, 2005, "as part of the record of these proceedings at this time but reserves the right further to evaluate and consider any objections to the brief (or exhibits to the brief) under the Federal Rules of Evidence in resolving this litigation." (Order, dated November 3, 2005; see Brief of Amici Curiae, dated October 26, 2005 ("Pre-Trial Amici Br.").)  Upon Plaintiffs' application, the Court has reviewed only the legal arguments, not the exhibits, presented in this brief.  Amici curiae also submitted a post-trial brief. (See Post-Trial Brief of Amici Curiae, dated November 18, 2005 ("Post-Trial Amici Br."), at 2 ("The limited intrusion of passengers' privacy interests implicated from a fleeting glance into carry-on bags cannot reasonably outweigh the government's interest in attempting to deter a potentially catastrophic terrorist attack against one of the country's most vulnerable targets.").)

In addition, the United States, through the Office of the United States Attorney for the Southern District of New York (Michael J. Garcia), has filed a Statement of Interest pursuant to 28 U.S.C. § 517.  (See Statement of Interest of the United States, dated November 18, 2005 ("U.S. Stmt. of Interest"), at 2 ("The Federal Government believes that the program, which provides for minimally intrusive searches of bags of randomly-selected passengers, satisfies the

included, inter alia, live cross and re-direct examination, the Court had an excellent opportunity to observe witness demeanor and assess witness credibility. (See Transcript of Proceedings, dated October 31 and November 1, 2005 ("Tr.").)  Eight witnesses testified for Plaintiffs, including all five Plaintiffs, Maggie Gram ("Gram"), the NYCLU employee who helped to coordinate Plaintiffs' "monitors" survey of the subway search checkpoints, Gene Russianoff ("Russianoff"), a staff attorney for the New York Public Interest Research Group's Straphangers Campaign who testified in his individual capacity concerning the "design and operation of the New York City subway system," and Charles Pena ("Pena"), a policy analyst for The Tauri Group, who testified regarding the purported ineffectiveness of the Program.[5]  Five witnesses testified for Defendants, including David Cohen ("Commissioner Cohen"), the NYPD's Deputy Commissioner for Intelligence and Michael Sheehan ("Commissioner Sheehan"), the NYPD's Deputy Commissioner for Counter-Terrorism, who both testified about, among other things, the terrorist threat to the New York City subway system and the effectiveness of the Container Inspection Program, Deputy Inspector Kerry Sweet ("Inspector Sweet"), the NYPD's Executive Officer of the Legal Bureau, who testified about the creation of the Program, Deputy Chief Owen Monaghan, the NYPD's Executive Officer of the Transit Bureau, who testified about the Program's implementation, and Termaine Garden, the Director of Customer Communications for the Department of Subways of the New York City Transit Authority, who testified about

_____

requirements of the Fourth Amendment.").)

[5]  Plaintiffs also presented the written testimony of fourteen "monitors" who were asked to observe and record the location and frequency of Container Inspection Program checkpoints. Based upon a stipulation, dated October 31, 2005, the monitors were not called for cross or re-direct examination at trial.

announcements of the Program in the subway system.  The Court also received into evidence the

deposition testimony of Richard A. Clarke ("Clarke"), Chairman of Good Harbor Consulting

LLC and former Chair of the Counter-Terrorism Security Group on the National Security

Council, pursuant to Federal Rule of Civil Procedure 32(a)(3)(B), (see Tr. at 8-9; see also

Deposition of Richard Clarke, dated October 5, 2005 ("Clarke Dep."); Declaration of Richard A.

Clarke, dated October 26, 2005), regarding the effectiveness of the Program.

At the close of trial, Plaintiffs requested that Defendants' information concerning the

frequency of inspection checkpoints be admitted into the record.  (Tr. at 268-69, 277 (Plaintiffs'

counsel stating "we renew our request that the city be required to produce to us and it be entered

into the record the information about the percentage of entrances that have checkpoints at any

given time"); see also id. at 278 (Defendants' counsel arguing "I don't know what it is plaintiffs

think [the Court] can do with that number . . . . I don't see what [] relevance [] producing the

number of stations has to the issues as they've now been framed by discovery and by the experts

in the case.").)  After having reviewed the information in camera on or about November 4, 2005,

the Court, on November 7, 2005, admitted into the record under seal and for opposing counsel's

"eyes only," the data compiled by Defendants as to the number and location of subway inspection

checkpoints conducted between July 22 and November 6, 2005.  (See Memorandum

Endorsement, dated November 7, 2005.)[6]

The parties submitted post-trial memoranda of law and proposed findings of fact and

conclusions of law on or about November 21, 2005, (see Plaintiffs' Post-Trial Memorandum of

Law, dated November 18, 2005 ("Pls.' Mem."); Plaintiffs' Proposed Findings of Fact, dated

---

[6]  The Court is also admitting the Plaintiffs' data.  See infra at 27-29.

November 18, 2005; Defendants' Post-Trial Memorandum of Law, dated November 21, 2005

("Defs.' Mem."); Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law,

dated November 21, 2005), and reply memoranda of law on November 29, 2005.  (See Plaintiffs'

Response to Defendants' Post-Trial Memorandum of Law (Amended), dated December 2, 2005

("Pls.' Reply"); Defendants' Post-Trial Reply Memorandum of Law, dated November 29, 2005

("Defs.' Reply").)  Plaintiffs submitted (under seal) Plaintiffs' Post-Trial Memorandum

Concerning Sealed Data About NYPD Checkpoints, dated November 18, 2005, and Plaintiffs'

Post-Trial Findings Of Fact Concerning Sealed Data About NYPD Checkpoints, dated

November 18, 2005.  The parties also submitted designations and counter-designations of

Commissioner Sheehan's deposition testimony, (see Corrected Plaintiffs' Designations of

Testimony from Desposition of Michael Sheehan, dated November 3, 2005; Defendants' Counter

Designations to Plaintiffs' Deposition Designations for Michael Sheehan), and a stipulation

regarding Clarke's credentials.  (See Stipulation, dated November 17, 2005 ("Clarke Stip."), ¶ 3

(noting Clarke had "acted as a senior White House Advisor to presidents Ronald Reagan, George

H.W. Bush, William Clinton and George W. Bush on issues of intelligence and counter-

terrorism.").)  The Court heard closing arguments from the parties on December 2, 2005.

* * *

The following are the Court's findings of fact and conclusions of law pursuant to Rule

52(a) of the Federal Rules of Civil Procedure.

**III.    Findings of Fact**

**(i)    New York City Subway System**

The New York City subway system operates twenty-four hours a day and includes

twenty-six interconnected lines and 468 passenger stations.  (Declaration of Gene Russianoff, dated October 25, 2005 ("Russianoff Decl."), ¶¶ 7, 9-10.)  "Many of the [stations] have more than one entrance . . . ."  (Id. ¶ 11.)  People seeking access to the subway system must pass through a turnstile entrance by swiping a fare card or MetroCard.  (Id. ¶ 8.)  New York's is "the largest, most heavily used subway system in the United States."  (Id. ¶ 5.)[7]

_____(ii)      **Threat of Terrorist Attack**

The risk of a terrorist bombing of New York City's subway system is real and substantial.  (See Tr. at 170 (Commissioner Sheehan testifying that "About 40 to 50 percent around the world, depending on how you count terrorists acts, are directed against transportation systems traditionally, and in New York City, our subway system, in my view, is a prime target for terrorists.")  Such an event could cause serious physical and economic injury, including loss of lives.  (Declaration of Deputy Commissioner Michael Sheehan, dated October 25, 2005 ("Sheehan Decl."), ¶ 18.)

Transportation systems are regarded as "attractive targets" because (i) "they carry large numbers of people at certain times of day and, if attacked, can produce high casualties;" (ii) "an attack has the potential to incapacitate all or a portion of the system" and cause service disruptions; (iii) such disruptions could have "widespread economic consequence[s];" and (iv) an attack could create "public fear and demoralization."  (Sheehan Decl. ¶ 18; see also Tr. at 170, 181 ("I believe New York City is the number one target . . . .").)  New York City's mass transit systems, including the subway system, have been targeted by terrorists in the past.  (See Declaration of Deputy Commissioner David Cohen, dated October 25, 2005 ("Cohen Decl."), ¶¶

---

[7]  Staten Island has a separate system called the Staten Island Railroad.

19-21.)

In 2004, terrorists bombed commuter trains in Madrid and the subway system in Moscow. See American-Arab Anti-Discrimination Comm. v. Mass. Bay Transp. Auth., Civil Action No. 04-11652, 2004 U.S. Dist. Lexis 14345, at *4 (D. Mass. July 28, 2004) (describing bombings "in Madrid on March 11, 2004, in which over 200 persons were killed, and one in Moscow on February 6, 2004, in which approximately forty persons were killed."). The bombings and attempted bombings in London's subway system, which occurred on July 7 and July 21, 2005, respectively, "raised the risk level for New York City's subway system" because (i) "they reaffirmed the shift to transportation systems as targets;" (ii) "they were carried out by individuals belonging to groups with links to similar groups operating in New York;" and (iii) "they were carried out notwithstanding a substantial security system which includes extensive video surveillance." (Sheehan Decl. ¶ 19.)[8]

### (iii)    Origin and Implementation of the Container Inspection Program

Commissioner Kelly and Commissioner Sheehan discussed the possibility of instituting a random bag search program in the New York City subway system before the London bombings. (See Tr. at 187.) The London attacks in July 2005 "brought a tremendous refocus to the subway system," (Tr. at 187), and, in response, Commissioner Sheehan and Commissioner Cohen recommended to Commissioner Kelly that "container inspections be initiated on the City's subway system." (Sheehan Decl. ¶ 7; see also Cohen Decl. ¶ 23 ("The attack on the London subway system on July 7, 2005, and the second attempt on July 21, 2005, combined with

---

[8]   Plaintiffs' witness, Charles Pena, agrees that "the New York City subway system is the kind of target that terrorists are interested in attacking." (Tr. at 244.)

previous threats to New York City's subways dictates the need to further strengthen our subway security posture.  Commissioner Sheehan and I both believed that we required an additional tool to enhance our subway deterrence and jointly recommended to Commissioner Kelly that a container inspection program be implemented immediately.").)  The Program was intended to address the threat of an explosive device being taken into the subway system in a carry-on container, as had occurred in Moscow, Madrid, and London.  (Sheehan Decl. ¶ 21.)  It was designed so that "[i]nspections would take place at all stations in the system on a predetermined but unpredictable [to the public] schedule."  (Id. ¶ 23.)[9]

On July 21, 2005, Commissioner Kelly met with his executive staff to discuss "the need for increased security in New York City's subways."  (Declaration of Kerry Sweet, dated October 25, 2005 ("Sweet Decl."), ¶ 3.)  Commissioner Kelly, Commissioner Cohen, Commissioner Sheehan, Inspector Sweet, and the NYPD's Deputy Commissioner of Legal Matters, Andrew Schaffer, were present at the meeting.  (See id. ¶ 3-4.)[10]  A second meeting was held on July 21, 2005, "at which the outline of the Container Inspection Program was discussed."  (Id. ¶ 5; see also Tr. at 128.)  Inspector Sweet was asked at these meetings to create a draft operational procedure "which would take into account the requirements imposed on such a program by the

_____

[9]  The Container Inspection Program is one of several law enforcement tools which combine to reduce – but not eliminate – the risk of a future terrorist attack.  (See Cohen Decl. ¶ 10 (programs such as Train Order Management, Critical Response Vehicle and the Container Inspection Program "reinforce one another"); see also id. ¶¶ 12 ("Our deployment patterns . . . are constantly shifting in a deliberate manner that may appear random, undefined, and unpredictable to terror operatives or cells."), 13 ("this flexible deployment and activity strategy is effective in helping deter terrorist operatives who might otherwise attempt to undertake an event in New York City"); Sheehan Decl. ¶¶ 11-12.)

[10]  Inspector Sweet, who is a lawyer as is Commissioner Schaffer, has twenty-four years of law enforcement experience.  (Tr. at 129.)

Constitution." (Id. ¶ 4, 6.)  With the aid of other members of the NYPD Legal Bureau, Inspector Sweet completed a draft operational procedure, and submitted it to Commissioner Kelly, who approved it on July 21, 2005.  (Sweet Decl. ¶ 7.)

The Container Inspection Program and procedures were communicated to all members of the NYPD on July 21, 2005 through the NYPD's internal communications system.  (See Sweet Decl. ¶ 7; Finest Message, dated July 21, 2005, Sweet Decl. Ex. A ("Finest Message").)  The Program went into effect on July 22, 2005, (Sweet Decl. ¶ 17), and it received widespread media coverage.  (See, e.g., Sewell Chan & Kareem Fahim, New York Starts To Inspect Bags On The Subways, N.Y. Times, July 22, 2005, at A1, Sweet Decl. Ex. 1.)

The Container Inspection Program's purpose, as set forth in the Finest Message, is to "increase deterrence and detection of potential terrorist activity and to give greater protection to the mass transit riding public . . . ."  (Finest Message at 1; see also Tr. at 172 ("It is primarily deterrent but also detection.").)  "At the commencement of the security checkpoint process, [a] supervisor will establish, in his/her activity log, the frequency of passengers subject to inspection (i.e. every fifth passenger, every twelfth passenger, every twentieth passenger, etc.)," based upon such factors as the volume of passengers at the station, the police personnel available to perform inspections, and the flow of commuter traffic into the station.  (Finest Message at 1.) "Supervisors may vary the frequency of inspections based on the commuter flow, either increasing or decreasing the number of inspections as appropriate."  (Id.)

"Any individual may refuse to permit [an] inspection and elect not to enter the mass transit system.  A refusal to permit inspection shall not constitute probable cause for an arrest or reasonable suspicion for a forcible stop, however, the individual will not be permitted access to

the system with the un-inspected item."  (Id. at 1-2.)  After an individual is indicated for

inspection, the police advise "that their entry into the [subway] system is subject to a search of

their backpack, container or carry-on item."  (Id. at 2.)

In performing a container search, which is usually accomplished in seconds and not

minutes, (see Declaration of Owen Monaghan, dated October 25, 2005 ("Monaghan Decl."), ¶ 8

& Ex. F ("Exhibit F") (videotapes of inspections at Program checkpoints)), police are instructed

as follows:

> Physically inspect any backpack, container and other carry-on item.  Inspection
> shall be limited to what is minimally necessary to ensure that the backpack,
> container or carry-on item does not contain an explosive device.
> The inspection shall not be longer than necessary to ensure that the individual is
> not carrying an explosive device.
> During the physical inspection, officers may open the container and physically
> inspect and manipulate the contents to ensure it does not contain an explosive
> device.

(Id.)[11]

On July 22, 2005, an informational meeting was held with the NYPD commanders

responsible for supervising the inspections.  (Sweet Decl. ¶ 17.)  On July 27 and July 28, 2005,

Inspector Sweet made a training presentation to supervisory and executive staff of the NYPD

Transit Bureau, who were directed to provide the same training to officers under their command.

(Sweet Decl. ¶¶ 18-23; Powerpoint Presentation, Sweet Decl. Ex. B ("Powerpoint Presentation").

Inspector Sweet's training stressed that the searches should be "as minimally intrusive as

possible."  (Powerpoint Presentation ("INSPECTION SHALL BE LIMITED TO WHAT IS

MINIMALLY NECESSARY TO ENSURE THAT BACKPACKS, CONTAINER OR CARRY-

---

[11]   The Court has viewed the subway inspection videotapes submitted as Exhibit F to the
Declaration of Chief Monaghan.  (See Monaghan Decl. Exs. F1, F2 & F3 (excerpts of F1 & F2).)

ON DOES NOT CONTAIN AN EXPLOSIVE DEVICE").)  Officers were directed **not** to: (a) "[i]nspect wallets, purses or other containers that are too small to contain an [explosive device];" (b) "[i]ntentionally look for other contraband or read or attempt to read any written or printed material;" or (c) "[r]emove individuals any significant distance from the entry point to transit (singling out individuals being inspected)."  (Id.)  The training also instructed that "notice of inspection should be provided at all stations" and that the "preferred method for inspecting is to ask the individual to show the officer what is in the container."  (Id. ("Allow passengers to open and manipulate their own belongings, if consistent with safety"); see also Monaghan Decl. ¶ 8 (only "[w]hen necessary, police officers move items obstructing their view and/or open containers capable of carrying an explosive devise").)  NYPD's Counter-Terrorism Bureau members gave instructions regarding "what [officers] should be alert to including the recognition of [various] types of explosives . . . ."  (Sweet Decl. ¶ 22.)

Implementation of the Container Inspection Program has been consistent with the Finest Message and the NYPD training.  (Monaghan Decl. ¶ 10.)  "Inspections take place daily at [selected] stations located in each of the five boroughs."  (Id. ¶ 8.)  For reasons related to available resources and the scope of the subway system, not all stations have inspections every day.  (Cohen Decl. ¶¶ 12, 25-26; see also Tr. at 29; Deposition of Michael Sheehan, dated September 29, 2005 ("Sheehan Dep."), at 202.)[12]  The Program operates randomly "every day at stations which cannot be predicted in advance . . . ."  (Cohn Decl. ¶¶ 25-26.)  It is designed to be flexible to account for changes in threat levels and to create uncertainty as to where and when

_____

[12] "A program that would completely secure the transit system with a 100% inspection rate would paralyze the system, a result that makes anything other than selected inspections impossible."  (Cohn Decl. ¶ 26.)

inspections will occur.  (Id. ¶¶ 12-13, 24; Sweet Decl. ¶ 11.)[13]  "A team of [uniformed] officers

supervised by a sergeant is assigned to each [inspection] checkpoint," (Monaghan Decl. ¶ 8; Tr.

at 133), which is established in close proximity to entrance turnstiles.  (Monaghan Decl. ¶ 8;

Exhibit F; Tr. at 133.)  Usually, a table is set up to facilitate inspections, (Tr. at 133), and the

flow of passenger traffic does not appear to the Court significantly to be impeded or interrupted.

(See Exhibit F; see also Tr. at 134-35; Finest Message at 1.)

 Notice to the public of the searches is provided by: (i) a 20 ½ inch by 30 inch poster

prominently displayed in the area of the inspection checkpoint, which reads in relatively large

letters: "NYPD / BACKPACKS AND OTHER CONTAINERS SUBJECT TO INSPECTION,"

(Monaghan Decl. ¶ 8 & Ex. G); (ii) the supervising sergeant who "advise[s] passengers with a

bullhorn that all persons entering the system may be subject to visual inspection and that anyone

not wishing to agree to the inspection would be directed out of the station," (id. ¶ 6), and (iii) the

media.  Announcements are also made at stations and on subway trains. (Declaration of Termain

Garden, dated October 25, 2005 ("Garden Decl."), ¶¶ 2-4 ("Passengers are advised that effective

July 22, 2005, their backpacks and other large containers are subject to random search by

police.").)

 The Finest Message does not specify the size of the container subject to inspection.  (See

---

 [13]  For example, on October 6, 7 and 10, 2005, the number of inspections increased because the NYPD had become alerted to what appeared to be a heightened threat of a terrorist attack on the subway system.  (See Plaintiffs' Letter to the Court, dated October 7, 2005 (seeking a delay in the trial to consider the spike in inspections and stating that "plaintiffs will not be proceeding next week with their request for permanent injunctive relief"); Defendants' Letter to the Court, dated October 7, 2005 (arguing "[t]he increased activity in the container inspection program, as a result of the elevated threat level, is part and parcel of how the container inspection program is designed to operate.").)

Monaghan Decl. ¶ 8.)  A police officer's discretion in conducting a search is limited to

determining whether a container is large enough to contain an explosive device based upon the

officer's "common sense," as informed by his or her experience and training.  (See id.; Tr. at

137; Sweet Decl. ¶ 22.)[14]

> **(iv)    Explosive Detection Technology**

_____On or about November 14, 2005, i.e. after the trial of this case, the NYPD implemented a

"pilot project" to determine the feasibility of using explosive detection technology in subway

inspections.  (See Declaration of James Hall, dated November 15, 2005 ("Hall Decl.");

Deposition of James P. Hall, dated November 16, 2005 ("Hall Dep."), at 27.)  By letter, dated

November 15, 2005, Plaintiffs requested that "the record in this matter . . . be reopened to include

evidence about this new procedure."  (Plaintiffs' Letter to the Court, dated November 15, 2005.)

Defendants, by letter dated November 15, 2004, opposed reopening the record.  (Defendants'

Letter to the Court, dated November 15, 2005 ("by letter dated October 17, 2005, [Defendants]

represented [to Plaintiffs] that the NYPD was considering a pilot project on an extremely limited

basis to determine the feasibility of using explosive detection technology for subway inspections

but that the use of such devices would not replace physical inspections currently performed under

the Container Inspection Program.").)  Following a telephone conference with the parties on

November 15, 2005, the Court reopened the record by directing Defendants to submit a

declaration explaining the nature of the new technology and by allowing Plaintiffs to depose the

declarant thereafter.  On the same day, Defendants submitted the declaration of James Hall,

_____

[14]    As of October 25, 2005, two individuals had been arrested for attempting to enter a
subway station at a different entrance after having refused to submit to a search.  (Monaghan
Decl. ¶ 9.)

Commanding Officer of the NYPD Transit Bureau, who explained the proposed technology as follows: a small piece of fabric, or swab, is run across the surface to be tested (e.g., a bag) and is then inserted into a device which performs an analysis for the presence of chemicals which may be used in explosives.  (Hall Decl. ¶ 4.)  Where the analysis results in a "positive" indication, (i) the passenger is informed of the positive indication, (ii) he or she is asked to open his or her bag for visual inspection and asked for identification, and (iii) an inquiry is made as to why there may have been a positive indication.  (Id. ¶ 9.)  The equipment "may . . . be effective in detecting some explosives, but not others," and it "cannot replace visual inspections . . . because given its present technological limitations, visual inspections may be the only means for detecting a particular type of explosive."  (Id. ¶¶ 4-5, 11; see also id. ¶ 6.)  The swab process takes between thirty and fifty seconds, including analysis.  (Hall Dep. at 20-21.)

The Court finds that this is a pilot or experimental project which does not alter the legal analysis of the Container Inspection Program.  (Hall Decl. ¶¶ 10 ("The use of the explosive detection technology by the NYPD is experimental, not operational.").)  The NYPD has purchased relatively few explosive detection devices and is employing them in a limited fashion to assess whether the equipment itself is reliable in the subway environment "during high volume passenger periods" and whether their use is "operationally feasible from the standpoint of the police officer on the scene."  (Id. ¶¶ 3, 8, 10-11 (NYPD "does not foresee widespread use"); Hall Dep. 27-28 (explosive detection technology used at one location daily from November 14 to 17, 2005).)

    **(v)**    **Witness Testimony**

**<u>Plaintiffs</u>**

Plaintiffs MacWade, Schonebaum, and Banerjee testified (anecdotally) that they had submitted to searches under the Container Inspection Program.  (See, e.g., Declaration of Brendan MacWade, dated October 14, 2005, ¶ 11 ("While my bag was searched, I felt violated.  I felt that the police did not need to be conducting searches, which I found intrusive."); see also Declaration of Andrew Schonebaum, dated October 7, 2005, ¶ 8; Declaration of Partha Banerjee, dated October 7, 2005, ¶ 13.)  Plaintiffs Gehring and Murphy were selected to be searched, but refused and left the subway rather than be searched.  (See, e.g., Declaration of Joseph Gehring, Jr., dated October 7, 2005, ¶¶ 7, 9 ("I now find myself extremely anxious when I see police officers in the New York City subway system . . . because I fear that I will be stopped and searched by the police although I have done nothing wrong."); see also Declaration of Norman Murphy, dated October 7, 2005, ¶ 6.)  Plaintiffs MacWade, Banerjee, Murphy, and Schonebaum have submitted to searches, including bag searches, to gain entrance at airports, courthouses and government buildings, hospitals, and sporting events, and Plaintiffs MacWade and Murphy testified that they expect that they will be subject to such searches in the future.  (See Tr. at 37-39; 65; 76, 78-79; 84-85, 90, 92.)

**Gene Russianoff**

Russianoff is a staff attorney for the New York Public Interest Research Group's Straphangers Campaign.  (Russianoff Decl. ¶ 1.)  He has twenty-four years of experience as a "transit advocate" and "extensive knowledge of the New York City subway system."  (Id.  ¶ 3.) Russianoff is qualified as an expert on the design and operation of the City's subway system,  see Fed. R. Evid. 702, but does not have expertise in law enforcement, security or counter-terrorism measures, see, e.g., Derienzo v. Trek Bicycle Corp., 376 F. Supp. 2d 537, 563 (S.D.N.Y. 2005);

Weinstein's Federal Evidence § 702.04[d][4] (2005), and was not offered by Plaintiffs to provide expert opinion as to the effectiveness of the Container Inspection Program..

Russianoff believes, based upon features of the New York City subway system, the advance notice of the checkpoint given to people entering a station, and the ability of people to walk away from a checkpoint, that "a person wishing to can easily evade the NYPD checkpoints and enter the system at entrances without checkpoints."  (Russianoff Decl. ¶¶ 19-20; Tr. at 203-05.)

**Charles Pena**

Pena had been employed, at the time of trial, for approximately two weeks by the Tauri Group, a company which provides consultative services to the Department of Defense and the Department of Homeland Security, including how to "detect and characterize biological attacks," "monitor for possible terrorist attacks with biological pathogens," and "assess[] and protect[] installations in the United States against a variety of attacks, including terrorist attacks with . . . weapons of mass destruction."  (Declaration of Charles Pena, dated October 25, 2005 ("Pena Decl."), ¶ 4; Tr. at 251, 260.)  Before joining the Tauri Group, from 2001 to 2005, Pena was employed by the Cato Institute, where he "examined terrorist activity and United States policies and programs to defend against terrorism," and authored studies analyzing "how to protect the general population against a smallpox bioterrorism threat" and "how to protect commercial aircraft against . . . shoulder-fired missile terrorist threat . . . ."  (Pena Decl. ¶ 5.)[15]  From 1994 to 1998, Pena was Executive Director of Mothers Against Drunk Driving, Northern Virginia

---

[15]  Pena is the author of a forthcoming book which examines "the risks posed by modern terrorism, the nature of the terrorist threat, and proposed cost-effective solutions . . . to provide protection against terrorist attacks."  (Id. ¶ 6; Tr. at 251.)

Chapter, and from 1998 to 2001, Pena was Executive Director of the American Council on Alcoholism.  (Pena Decl. Ex. A.)[16]

Pena's opinion is that the deterrent effect of the Container Inspection Program is "close to zero," (Pena Decl. ¶ 17), principally because "you can walk away" from an inspection.  (See Tr. at 227 ("The feature that you can walk away is the most glaring problem that I see with the container search program.").)  He testified that deterrence arises when "a system . . . creates sufficient certainty of detection and capture that terrorists will choose a different target,"  (Pena Decl. ¶ 22), and concluded that "the NYPD search program has no meaningful deterrent value . . . ."  (Id. ¶ 23.)

The Court admits Pena's expert testimony despite the Court's reservation that his opinions are neither adequately supported nor dispositive of the issues presented here.  Pena's opinions are unpersuasive because, among other reasons: (i) he acknowledged: "I admit that I am not a career expert in counterrorism," (Tr. at 235); (ii) he appears to have relied upon general expertise as a "systems analyst," which was not articulated at trial, (see Pena Decl. ¶ 10 (stating that his "training and experience is as an analyst and my skills are based on being able to understand how a 'system' works and are not dependent on being a hands-on expert in the substance of the specific area in which the system is operating."); Tr. at 248); (iii) he has no discernable training or experience in subway transit security, (Tr. at 221); (iv) he has never had access to classified intelligence about terrorism, (id. at 220, 238-39, 242-44), and has never evaluated intelligence information for the purpose of advising about terrorism, (id. at 243-44);

---

[16]  From 1982 to 1993, Pena analyzed missile systems and Cold War-era nuclear deterrence.  (Id. ¶ 8; Tr. at 252.)

and (v) the opinions of Commissioners Cohen and Sheehan are simply better informed and more

credible.  See, e.g., Fujistu Ltd. v. Federal Express Corp., 247 F.3d 423, 435 (2d Cir. 2001) ("on

issues of credibility and the importance of his testimony, I believe that [Fujistu's expert]

testimony is the more credible [than FedEx's expert] and it should be accepted"); SEC v. Price

Waterhouse, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992) ("the Court concludes, as a matter of fact,

that [defendant's experts] were more credible, persuasive and reasonable in their analysis and

conclusions than were the [plaintiff's] expert witnesses").

        **David Cohen**

        Commissioner Cohen has been Deputy Commissioner for Intelligence for the NYPD,

with responsibility for the NYPD's intelligence programs and operations, since February 2002.

(Cohen Decl. ¶¶ 1, 6.)  Together with the NYPD's Counter-Terrorism Bureau, the Division

headed by Commissioner Cohen collects information and intelligence generated at local,

national, and international levels, tracking "terrorist plans, movements, techniques,

methodologies and operational patterns," in an effort effectively to deploy NYPD resources to

address the threat of terrorism.  (See Cohen Decl. ¶¶ 8-9.)  Prior to joining the NYPD,

Commissioner Cohen was employed by the CIA in both its analysis and operations divisions for

thirty-five years.  (Id. ¶¶ 2, 6.)  In 1980, as Director of the Office of Global Issues, he established

the CIA's first analytic program on terrorism, assessing "international terrorism, their

capabilities, their programs, their strategies, their tactics."  (Id.; Tr. at 20-21.)  As Deputy

Director of the Directorate of Operations from 1991-1995, he was charged with, among other

things, signing off on "[t]he analytical product of the counter-terrorism center" at the CIA.

(Cohen Decl. ¶ 4; Tr. at 21.)

Commissioner Cohen is clearly an expert in the field of terrorism and counter-terrorism, and how New York City combats terrorism.  See Fed. R. Evid. 702.  His testimony that the Container Inspection Program has a deterrent effect which is "embedded in the uncertainty regarding where and when an inspection will occur" was both credible and persuasive.  (See Cohen Decl. ¶ 25; see also id. ¶¶ 11, 27; Tr. at 28.)  See, e.g., Fujistu, 247 F.3d at 435; Price Waterhouse, 797 F. Supp. at 1241.

**Michael Sheehan**

Commissioner Sheehan has been Deputy Commissioner for Counter-Terrorism for the NYPD since June 2003.  (Sheehan Decl. ¶¶ 1, 6.)  Commissioner Sheehan's responsibilities include command of the NYPD component of the Federal Bureau of Investigation Joint Terrorism Task Force and the NYPD Division of Counter-Terrorism, which seeks to "prevent, deter, disrupt and respond to terrorism threats in the City through terrorist investigations, intelligence collection and analysis, critical infrastructure protection, coordination of defensive programs and training."  (Id. ¶ 6.)  Prior to joining the NYPD, Commissioner Sheehan gained nearly thirty years of experience in counter-terrorism.  (Id. ¶¶ 1, 6.)  Beginning in 1979, he was a member of the Special Forces of the United States Army, assigned to a counter-terrorism unit. (Id. ¶ 2.)  In 1989, he joined the National Security Council as Director of International Programs, and in 1993 he was named Special Counselor to the Permanent Representative of the United States to the United Nations.  (Id.)  In 1995, Commissioner Sheehan re-joined the National Security Council as Director of Global Issues, and in 1997, Commissioner Sheehan became Deputy Assistant Secretary at the State Department's Bureau of International Organizations Affairs.  (Id.)  In 1998, he became Ambassador-at-Large for Counter-Terrorism for the State

Department where he was, under President William J. Clinton, the Administration's principal spokesperson on international counter-terrorism policy.  (Id.)  From 2001 to 2003, Commissioner Sheehan was Assistant Secretary General of the United Nations, Department of Peacekeeping Operations, and was part of the Secretary-General's working group on counter-terrorism.  (Id. ¶ 3.)  He has testified before Congress on counter-terrorism issues.  (Id. ¶ 4.)

Commissioner Sheehan is clearly an expert in the field of terrorism and counter-terrorism and how New York City combats terrorism.  See Fed. R. Evid. 702.  His testimony that the Container Inspection Program "dramatically improves the security posture" of New York City's subway system was credible and persuasive.  (See Tr. at 180.)  See, e.g., Fujistu, 247 F.3d at 435; Price Waterhouse, 797 F. Supp. at 1241.

**Richard A. Clarke**

Clarke has "acted as a senior White House Advisor to presidents Ronald Reagan, George H.W. Bush, William Clinton and George W. Bush on issues of intelligence and counter-terrorism."  (Clarke Stip. ¶ 3.)  From 1985 to 1992, he served in the State Department as Assistant Secretary of State of Politico-Military Affairs and Deputy Assistant Secretary of State for Intelligence.  (Id.)  From 1992 to 2003, he served on the National Security Council as Chair of the Counter-Terrorism Security Group, National Coordinator for Security, Infrastructure Protection, and Counter-Terrorism, and as Special Advisor.  (Id.)  His responsibilities throughout his career have caused him to "analyze classified intelligence and other data so that [he] could provide advice about the nature and existence of terrorist threats and the needed governmental

response."  (Id. ¶ 4.)[17]

Clarke is clearly an expert in the field of terrorism and counter-terrorism.  See Fed. R. Evid. 702.  His testimony that the Container Inspection Program achieves "a desirable level of deterrence" reenforces the opinions of Commissioners Cohen and Sheehan.  (See Clarke Dep. at 38.)

### (vi)     Effectiveness of Container Inspection Program

The Court concludes, principally based upon the testimony of Defendants' experts, that the Container Inspection Program is an effective measure to help deter and detect a terrorist attack against New York City's subway system.  (See Tr. at 180 ("There is no doubt in my mind that the introduction of the bag searches, even though it is random, even though it is not 100 percent, dramatically improves the security posture of the huge, sprawling system which I believe is clearly a top-tier target . . . right now as we speak."); Cohen Decl. ¶¶ 11 ("Any program that changes the odds in our favor by making terrorist operations more difficult is one we consider effective."), 27 ("It does not guarantee that an attack will not happen, but adds an important and additional level to existing security which makes the subway system safer."); Tr. at 28.)

Because the threat of terrorism is great and the consequence(s) of unpreparedness may be catastrophic, it would seem foolish not to rely upon those qualified persons in the best position to know.  (See Pre-Trial Amici Brief, at 14 ("[I]t would be inappropriate for courts to second-guess the judgments of law enforcement and other public officials who are charged with protecting the public and making difficult choices of resource allocation.").)

---

[17]  Clarke is the author of several books, including one published in 2004 which analyzes "how several presidential administrations . . . addressed the threats posed to America by international terrorism."  (Clarke Stip. ¶ 6.)

The record shows that terrorists "look for situations which provide a high level of confidence that an attack will be successful," (Sheehan Decl. ¶ 13; Tr. at 172), and do extensive planning.  (Sheehan Decl. ¶ 14 (they assess "whether the officials responsible for the safety of the target area take security seriously" and "the overall level of alertness," and "engage in surveillance of the selected targets for an extended period"); Cohen Decl. ¶ 13 ("Planners or operators typically have identified a specific location and prepare concrete plans of action . . . . Preplanning is designed around the target itself and would typically include an evaluation of methods of access to the target as well as assessments of security around the target.").)[18]  Prior to the implementation of the Container Inspection Program,"there was no security in the City's subway system that created any risk of detection to someone entering with a container bomb, which created a tremendous strategic advantage to anyone planning an attack."  (Sheehan Decl. ¶ 22.)

Commissioners Cohen and Sheehan testified persuasively that, because of the random nature of the Container Inspection Program, i.e., because when and where an inspection will occur is not revealed in advance, the Program adds uncertainty and unpredictability to the planning and implementation of a terrorist attack which, in turn, increases the risk of failure and helps to deter an attack.  (See Cohen Decl ¶ 14 ("the security regime observed by the terrorist operative during pre-event surveillance could change radically by the time the operation is triggered."); Sheehan Decl. ¶¶ 15-16 ("Building unpredictability into security measures complicates terrorists' planning because they cannot determine through mere observation, what

---

[18]  Pena stated "I agree with the police commissioners and their characterization of the threat."  (Tr. at 257.)  (See also Pena Decl. ¶ 18; Clarke Dep. at 47 & 49.)

will be unprotected at any given point in time."); Sheehan Dep. at 175; Tr. at 28-30; Clarke Dep. at 31.)[19]

The Court is also persuaded by Commissioner Sheehan's opinion that the Program "reinforces the awareness of police officers, transit workers and the public of the need to be alert. That alertness is an important component of a counter-terrorism program."  (Sheehan Decl. ¶ 26.)[20]

During the trial, Defendants effectively countered Plaintiffs' argument that the Program is not effective due to "the ease with which one can evade checkpoints and enter the subway system."  (Pls.' Mem. at 32.)  That is, while acknowledging that the Program does not provide full coverage of the (468 station) subway system and that a person may leave the station to avoid an inspection, Commissioners Cohen and Sheehan explained that these factors alone "do[] not undermine the deterrent effect," (Sheehan Decl. ¶ 25), which is "embedded in the uncertainty regarding where and when an inspection will occur rather than in the absolute number of inspections."  (Cohen Decl. ¶ 25; see also Sheehan Decl. ¶ 28 ("Managing the terrorism threat . . . requires that scarce resources be deployed in the most effective way to create uncertainty about the level of security.  The uncertainty creates the risk of detection and failure that terrorists avoid and in that way, creates a deterrent effect."); see also Clarke Dep. at 38-39 ("The presence of the

_____

[19]  The media has reported that the element of randomness is being discussed in other search contexts as well.  See Eric Lipton, Significant Changes in Air Passenger Screening Lie Ahead, N.Y. Times, December 1, 2005, at A1.

[20]  See also Monaghan Decl. ¶ 9 (noting that after passenger selected for inspection had refused and exited the station, "[w]hen he entered the station at another entrance, he was observed by the supervising officer and arrested.").

program itself is the most important thing").)[21]

Plaintiffs' witness, Charles Pena, while acknowledging that introducing uncertainty "complicates the planning for potential terrorists" (Tr. at 255) and can "play a role in deterring terrorist activity," (Pena Decl. ¶ 25), argued that "the NYPD program does not introduce enough uncertainty to have any measurable deterrent effect."  (Pena Decl. ¶ 25; Tr. at 227, 255.)  Apart from presenting the ironic position that less intrusiveness renders the Program less effective, Pena offered no evidence of the measure of "enough uncertainty," and he did not at all rebut the evidence presented by Defendants that the Program has a meaningful deterrent effect.  (See Tr. at 249 ("Q: . . . [W]hen did you cross the threshold from ineffective to effective.  That's what I'm trying to figure out.  Do you know the answer to that?  A: No . . . . I wish I did."); id. at 228-29 ("Q: What percent less than a hundred percent and less than all of the time – where is the threshold? . . . . A: . . . **The answer is we don't know what that number is.**") (emphasis added); see also infra at 30-31.)  See Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 676 n.4 (1989) (citing Nat'l Treasury Employees Union v. Von Raab, 816 F.2d 170, 180 (5th Cir. 1987) ("The dissent, inconsistently it seems to us, argues that the testing program would be more likely to be constitutional if it were more pervasive and more invasive of privacy.")).[22]

---

[21] Common sense tells us that "more is better than some, some is better than none, none helps [terrorists]."  (Tr. at 29.)  And, it seems equally obvious that "the more checkpoints there are, the greater the deterrent effect of the program."  (Tr. at 184; see also Clarke Dep. at 8 ("as long as there is some checking, there is going to be somewhat of a deterrence.  The more checking, the more deterrence.").)

[22] It is also difficult to reconcile Pena's opinion that placing police officers at a particular location (for example, a bridge or tunnel) is "an effective counterterrorism measure" and has "deterrent value," (Tr. at 245-46), with his criticism of the Program, which entails additional uniformed presence in the subway system.

**(vii)    Statistical Data**

Following the Court's August 26, 2005 Discovery Order, Plaintiffs undertook to record the frequency and location of subway searches by first-hand observation.  (See Plaintiffs' Letter to the Court, dated August 29, 2005; Transcript of Proceedings, dated August 30, 2005, at 3.) Fourteen NYCLU monitors rode subway train lines over a twenty-three day period, from August 25 to September 16, 2005, apparently exiting briefly at each stop to observe and record whether an inspection checkpoint was being conducted.  (Tr. at 7-8, 148; Declaration of Maggie Gram, dated October 26, 2005 ("Gram Decl."); id. Ex. A.)  Monitors were instructed, among other things, to "walk the entire perimeter of the area inside the turnstiles . . . ."  (Gram Decl. Ex. A.) The information collected by the monitors was then entered into a spreadsheet, (Gram Decl. ¶¶ 7-9; Declaration of Alejandro Berthe-Suarez, dated October 26, 2005), and, based upon the data recorded, Plaintiffs concluded that "[a] survey of 5,562 subway turnstile entrances (at 3,288 subway stations) . . . found a total of 34 searches."  (Pls.' Mem. at 10.)

The Court finds Plaintiffs' data is of little or no probative value because the monitoring methodology and its implementation were hasty and unscientific.  For example, one form submitted by Plaintiffs indicates that on August 26, 2005 a monitor checked twenty-two "entrances" at ten stops on the "1" Line, from Canal Street to 50th Street, presumably boarding nine separate trains, within forty minutes.  (See Declaration of John Passanante, dated October 7, 2005, Ex. B; Tr. at 152, 216.)  This suggests that, on average, the monitor walked the inside perimeter of a station, boarded a new train, and traveled to the next station all within approximately four minutes on that particular day.  The monitor presented no information about searches which may have occurred at these stations at any other times.  Another monitor reported

that on September 1, 2005 he checked seven separate entrances at the Union Square station on

the "L" line and traveled to the next stop, Third Avenue and 14th Street, presumably on a train

different than the one on which he arrived, within five minutes.  (See Declaration of Dwight

Cacho, dated October 24, 2005, Ex. B; Tr. at 152, 216.)  Similarly, this monitor presented no

information about searches which may have occurred at this station at other times.[23]  With

respect to a monitor who inspected stations between 145th Street and Van Cortlandt Park, the

following colloquy occurred between the Court and Russianoff:

> The Court: . . . I am trying to figure out in my own mind how reliable, I guess, or
> accurate this – assuming that it's reliable in other ways, but it seems to me bottom
> line that is an awfully short time to board a train, inspect the station, reboard a
> train, go to the next stop, inspect the station, and I just wondered what your
> opinion, being an expert in the operation of the system, is.
>
> The Witness: I didn't participate in the survey and so I'm unaware of all the
> methodologies --
>
> The Court: I will just show you what I am looking at just so you know.  It's one of
> the exhibits.
>
> The Witness: One thing I could say is the line they were on, the one is allegedly
> the more frequently operated line in the system.  If they were doing this on, let's
> say, the C or the B you would find [] greater gaps between the inspections.  You
> know, I can't verify these times, all I can say that it is a line that operates quite
> frequently.

(Tr. at 213-14.)

    Most importantly, no evidence was presented by Plaintiffs from which the Court could

possibly find that the data collected by the NYCLU monitors is a representative sample of the

_____

[23]  Indeed, Gram testified that there is no way to know from Plaintiffs' data whether
inspections were conducted at stations that were not visited by monitors on a particular day or
whether inspections were conducted at stations at times other than during monitors' brief visits.
(See Tr. at 151-54.)

Container Inspection Program.[24]  (See Tr. at 156-58 ("The Court: . . . I am just trying to ask if anybody with formal training in sampling or polling, so to speak, was employed in this data collection?  The Witness: . . . No, not as far as I know. . . . The Court: I am trying to figure out even assuming it were reliable, do you have a sense or the knowledge how well, how your sample relates to the universe of searches and the answer is 'no.'  The Witness: Right.").)  Indeed, Plaintiffs' counsel conceded that "we are not presenting it as a statistically significant exercise in terms of being able to tell you more than what you can tell from the results of the survey itself," (Tr. at 268), and that "**[i]t does not purport to do and we do not suggest that it does provide the Court with a set of data that it can extrapolate to the entire program.**"  (Id. at 270 (emphasis added).)

As noted above, Defendants submitted the actual data for the Court's in camera review and opposing counsel's "eyes only" inspection as to the number of searches at the 468 subway stations conducted between July 22, 2005 and November 6, 2005.  The City's data has been made part of the record under seal because of its sensitive and privileged nature.  (See Memorandum Endorsement, dated November 7, 2005.)  Without waiving or breaching the law enforcement privilege and the confidentiality of Defendants' data, the following conclusions are, in the Court's view, irrefutable: (1) the City does, in fact, have an ongoing subway search program as described at pages 9-15, supra; (2) between July 22 and November 6, subway searches were conducted by the NYPD every day, except for September 13, 2005; and (3) the number of checkpoints (34) Plaintiffs found between August 25 and September 16, 2005 bears

---

[24]    No witness was called by Plaintiffs to testify as to the significance of this data.  (Tr. at 248; see also supra at 26 & infra at 28-31.)

absolutely no relationship to (and substantially understates[25]) the total number of Container

Inspection searches conducted during that period. (<u>See</u> Court Exhibits 1 & 2.)

       The Court does not believe that more detailed discussion of the number (or location) of

inspection checkpoints is either necessary or probative. First, as stated in the August 26, 2005

Discovery Order, that information is sensitive and privileged. (<u>See</u> August 26, 2005 Discovery

Order at 4 (the documents and information "reflect and detail law enforcement techniques and

procedures"); <u>see also</u> Clarke Dep. at 53-54.) Second, the Court requested that the parties

present evidence as to whether the number and/or location of inspections is necessary or useful in

the determination of whether the Container Inspection Program is effective. (<u>See</u> August 25,

2005 Discovery Order at 7 ("The parties are directed to address at the . . . evidentiary hearing . . .

whether or not the disputed documents and information are relevant and 'substantially needed'

by Plaintiffs to prove their case."); Transcript of Proceedings, dated August 30, 2005, at 5 ("one

of the issues that I asked both sides to address at the hearing was the need for or absence of need

for the disputed information"). The evidence at trial established overwhelmingly that the number

of inspections was **not** necessary or useful to any witnesses' assessment of the effectiveness of

the Program. Plaintiffs' witness, Charles Pena, testified that his assessment of the effectiveness

of the program was not based on anything in Plaintiffs' own survey and that an analysis of that

data was not necessary for him to form his opinion. (<u>See</u> Tr. at 248, <u>see id.</u> at 227.) He also

conceded that he did not know what number of searches would be effective. (Tr. at 249; Tr. 228-

---

[25] At oral argument, Plaintiffs' counsel estimated that in excess of 400,000 searches have taken place between July 21 and October 31, 2005.

29.)[26]  (See also Cohen Decl. ¶ 25; Clarke Dep. at 51-55 ("I think the precise number [of

checkpoints] is of less value and importance than the fact that it's random and the fact that it is

routine."; "I think playing the numbers game is a not a very productive part of the analysis.");

Post-Trial Amici Br. at 10 ("Regardless of which party has the burden of proof, for the Court to

find for Plaintiffs under their proposed Fourth Amendment test, the Court would have to

determine where the point lies between a program that is constitutional and one that is not.  Yet,

any attempt to do so in the context of an anti-terrorism program designed to deter terrorist

conduct would be impractical and inherently arbitrary.").)[27]  Third, the Court is persuaded that

the randomness of the searches rather than the actual number of searches conducted is (primarily)

what makes the Container Inspection Program effective.  (See Cohen Decl. ¶ 25 ("The deterrent

effect is embedded in the uncertainty regarding where and when an inspection will occur rather

than in the absolute number of inspections."); Sheehan Decl. ¶ 28; Tr. at 27-28; see also Clarke

Dep. at 38-39.)  See also Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 453-54 (1990)

(counseling against "searching examination of 'effectiveness'").

## IV.    Conclusions of Law

### (i)    The Fourth Amendment and the "Special Needs" Doctrine

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be violated, and no warrants
shall issue, but upon probable cause, supported by oath or affirmation, and

---

[26]  Pena also testified (unhelpfully in the Court's view) that if ninety percent of stations
were being inspected, the Program "might" be effective, even if an individual could walk away
from the checkpoint.  (Tr. at 248-49 ("Ninety percent might be the right number.").)

[27]  See also Tr. at 180 ("counterterrorism is as much an art as it is science").

particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"  <u>Veronia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 652 (1995).  "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing."  <u>Chandler v. Miller</u>, 520 U.S. 305, 313 (1997) (citing <u>Acton</u>, 515 U.S. at 652-53).  "'[I]n certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion.'"  <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls</u>, 536 U.S. 822, 829 (2002) (quoting <u>Von Raab</u>, 489 U.S. at 668).  "Therefore, in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  <u>Earls</u>, 536 U.S. at 829 (quoting <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987)); <u>see also</u> <u>Chandler</u>, 520 U.S. at 323 ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'– for example, searches now routine at airports and at entrances to courts and other official buildings.").

Where a special need exists, "what is required is 'a fact-specific balancing of the intrusion . . . against the promotion of legitimate governmental interests'" to determine if the program is reasonable under the Fourth Amendment.  <u>N.G. v. Connecticut</u>, 382 F.3d 225, 231 (2d Cir. 2004) (quoting <u>Earls</u>, 536 U.S. at 830); <u>see also</u> <u>Skinner v. Railway Labor Executives' Assoc.</u>, 489 U.S. 602, 619 (1989); <u>Delaware v. Prouse</u>, 440 U.S. 648, 654 (1979).  Courts weigh "[1] the gravity of the public concerns served by the [challenged governmental conduct], [2] the degree to which the

[challenged conduct] advances the public interest, and [3] the severity of the interference with

individual liberty." Illinois v. Lidster, 540 U.S. 419, 427 (2004) (internal quotation omitted);

Maxwell v. City of New York, 102 F.3d 644, 667 (2d Cir. 1996); see also Palmieri v. Lynch, 392

F.3d 73, 81 (2d Cir. 2004) (courts analyze "'the nature of the privacy interest allegedly

compromised by the [challenged governmental conduct],' Earls, 536 U.S. at 830; . . . 'the

character of the intrusion imposed by the [challenged conduct],' id. at 832;  and . . . 'the nature

and immediacy of the [state's] concerns and the efficacy of the [governmental conduct] in

meeting them,' id. at 834.").[28]

**(ii)    The Container Inspection Program Addresses a Special Need**

The "risk to public safety" of a terrorist bombing of New York City's subway system "is

substantial and real."  Chandler, 520 U.S. at 323; see also American-Arab Anti-Discrimination

Comm. v. Mass. Bay Transp. Auth., Civil Action No. 04-11652, 2004 U.S. Dist. Lexis 14345, at

---

[28]  The Court finds that Defendants have the burden of producing evidence of a "special
need" and supporting the factors which must be balanced under the "special needs" doctrine, but
that Plaintiffs retain the (ultimate) burden of persuasion that the Container Inspection Program is
unreasonable.  See Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2d Cir. 1991) (while
"searches and seizures conducted without warrants are presumptively unreasonable . . . [t]he
operation of this presumption . . . cannot serve to place on the defendant the burden of proving
that the official action was reasonable.  Rather, the presumption may cast upon the defendant the
duty of producing evidence of consent or search incident to an arrest or other exceptions to the
warrant requirement.  However, the ultimate risk of nonpersuasion must remain squarely on the
plaintiff in accordance with established principles governing civil trials."); see also Fed. R. Evid.
301; Chandler, 520 U.S. at 305 ("Georgia has failed to show . . . a special need"); Pls.' Reply at 2
("The plaintiffs . . .  of course bear the ultimate 'burden of persuasion' on their Fourth
Amendment claim.").  Even assuming, arguendo, that Defendants are required to carry a more
substantial burden because "[t]he City has superior access to evidence" concerning "the
compelling justification for the suspicionless search program and . . . the effectiveness of the
program," (Pls.' Reply at 2), the evidence presented by Defendants overwhelms that presented by
Plaintiffs, and has persuaded the Court that the Container Inspection Program is reasonable under
the Fourth Amendment.

*5 (D. Mass. July 28, 2004) (finding threat to subway trains near Democratic National Convention was "real and not imagined" following Madrid and Moscow bombings and considering terrorists' intention to disrupt democratic political process).  (See, e.g., Sheehan Decl. ¶¶ 18-19; Cohen Decl. ¶¶ 19-21; Tr. at 170, 181.)  See also Earls, 536 U.S. at 834-35; Von Raab, 489 U.S. at 675 n.3 ("It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context."); Legal Aid Soc'y of Orange County v. Crosson, 784 F. Supp. 1127, 1131 (S.D.N.Y 1992).

The special need addressed by the Container Inspection Program is the need to reduce (deter and detect) the risk of a terrorist attack on the subways.  It is not "to detect evidence of ordinary criminal wrongdoing."  See City of Indianapolis v. Edmond, 531 U.S. 31, 41 (2000); see also Lidster, 540 U.S. at 423.  The Program addresses a problem well beyond the "normal need for law enforcement" or a "general interest in crime control."  See Edmond, 531 U.S. at 37-38, 47-48; Sitz, 496 U.S. at 450.[29]  (See Finest Message; Powerpoint Presentation; see also Defs.' Mem. at 11 ("the fact that passengers have advance notice of the inspection and can avoid inspection by leaving the system are indicative of a program designed not to search for contraband but to keep explosives out").)

**(iii)   The Governmental Interest Behind the Container Inspection Program Is Compelling**

The need to prevent a terrorist bombing of the New York City subway system is a

---

[29]   Amici argue that considering the Container Inspection Program is designed to thwart terrorists who "carefully plan their targets" and "attempt to conceal explosive devices in carry-on bags without arousing any suspicion" and "given the undisputed evidence of the magnitude of the New York City subway system . . . it would be impractical to require individualized suspicion." (Post-Trial Amici Br. at 7 (citing Sitz, 496 U.S. at 449-50; Sheehan Decl. ¶ 21).)

governmental interest of the very highest order.  See Sitz, 496 U.S. at 449, 451; Von Raab, 489 U.S. at 670, 673-74; Martinez-Fuerte, 428 U.S. at 556-57; Mollica v. Volker, 229 F.3d 366, 370 (2d Cir. 2000) ("interest in preserving human life" is "extremely weighty"); United States v. Edwards, 498 F.2d 496, 500 (2d Cir. 1974); see also Acton, 515 U.S. at 662-63; Palmieri, 392 F.3d at 85.

### (iv)     The Container Inspection Program Is (Reasonably) Effective

"[T]he effectiveness inquiry involves only the question whether the [search] is a 'reasonable method of deterring the prohibited conduct;' the test does not require that the checkpoint be 'the most effective measure.'"  Mollica, 229 F.3d at 370 (quoting Maxwell, 102 F.3d at 667); see also Earls, 536 U.S. at 825, 877 (holding school's policy of drug testing students who participate in extracurricular activities to be constitutional "[b]ecause this Policy reasonably serves the School District's important interest in detecting and preventing drug use among its students" and finding that "testing students who participate in extracurricular activities is a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use.").  And, as noted, the United States Supreme Court has counseled against a "searching examination of 'effectiveness'" by the Court.  See Sitz, 496 U.S. at 454.  Consideration of the effectiveness of a special needs program

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. . . . [F]or purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers . . . .

Id. at 453-54.

-35-

Courts may rely upon non-statistical evidence such as expert testimony in assessing effectiveness.  See United States v. Davis, 270 F.3d 977, 983 (D.C. Cir. 2001) (citing Martinez-Fuerte, 428 U.S. 543).  Here, the Court is comfortable relying principally upon the expert testimony of Commissioners Cohen and Sheehan (supported by Clarke).  (See Cohen Decl. ¶¶ 11, 25 (Container Inspection Program's deterrent effect "embedded in the uncertainty regarding where and when an inspection will occur"), 27 (Program "makes the subway system safer"); Tr. at 180 ("There is no doubt in my mind that the introduction of the bag searches . . . dramatically improves the security posture of the huge, sprawling system . . . .").)

In the Court's view, there is no doubt that the Container Inspection Program is a reasonable method of deterring (and detecting) a terrorist bombing of the New York City subway system.  See Earls, 536 U.S. at 877; Von Raab, 489 U.S. at 676 (finding that, although an employee could avoid detection under drug testing policy through various techniques, these techniques were "fraught with uncertainty and risks for those employees who venture to attempt them"); see also id. at 675 n.3 & 676 n.4 (citing Von Raab, 816 F.2d at 180); United States v. Marquez, 410 F.3d 612, 618 (9th Cir. 2005) (the "very randomness" of selection for additional screening procedure at airports furthers goals of "detection and deterrence of airborne terrorism"); United States v. Green, 293 F.3d 855, 862 (5th Cir. 2002) (upholding suspicionless checkpoint on military installation which stopped every sixth car because "[s]topping vehicles at regular intervals, rather than every one, first husbands the resources of law enforcement.  It also reasonably advances the purposes of the checkpoint because it deters individuals from driving while unlicensed and or transporting weapons and thereby endangering base personnel.  It provides a gauntlet, random as it is, that persons bent on mischief must traverse."); American-

<u>Arab Anti-Discrimination Comm.</u>, 2004 U.S. Dist. Lexis 14345, at *6 ("[t]he essential purpose of the scheme is . . . to deter persons carrying such materials from seeking to board at all") (internal quotation omitted); <u>see also</u> U.S. Stmt. of Interest at 17 ("The use of random screenings, with varying frequency based on changes in threat levels and available intelligence, is in fact a mark of the overall reasonableness of the program, as it demonstrates New York City's balancing of the potential threat to public safety with the interests of subway passengers.  Indeed, the scheme implements precisely the type of 'suspicionless searches calibrated to [the] risk' . . . that the Supreme Court has recognized as reasonable.") (quoting <u>Chandler</u>, 520 U.S. at 323).[30]

    **(v)**    **The Container Inspection Program Only Minimally Intrudes Upon Privacy Interests**

Against the compelling governmental interest in preventing a terrorist attack, the Court has weighed the (relatively limited) level of intrusion imposed upon subway riders.  <u>See, e.g.,</u> <u>Sitz</u>, 496 U.S. at 452 (objective intrusion measured by duration and intensity, subjective intrusion measured by potential for creating fear and surprise); <u>Green</u>, 293 F.3d at 860.  To be reasonable under the Fourth Amendment, a search program need not employ the least intrusive means practicable.  <u>See Earls</u>, 536 U.S. at 837 ("this Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'") (quoting <u>Martinez-Fuerte</u>,

---

[30]  <u>See also</u> Defs.' Reply at 6 ("[W]here the conduct is such that detection is not likely, as in the case of terrorists carrying explosives into the subway, the value of the program in advancing the governmental purpose can never be judged by reference to evidence of detection because such evidence will rarely exist.  In these cases, effectiveness in fulfilling the special needs is judged not by statistical proof, but by program design.") (citing, among other cases, <u>Lidster</u>, 540 U.S. at 891; <u>Von Raab</u>, 489 U.S. at 676; <u>Skinner</u>, 489 U.S. at 630).

428 U.S. at 556); see also Acton, 515 U.S. at 663 (citing Skinner, 489 U.S. at 1419 n.9). At the same time, "the means employed must bear 'a close and substantial relation,' to the government's interest in pursuing the search." United States v. Lifshitz, 369 F.3d 173, 192 (2d Cir. 2004) (citing Earls, 536 U.S. at 837; Von Raab, 489 U.S. at 676); see id. at 190 (search should not "sweep so broadly as to draw a wide swath of extraneous material into its net").

The Court finds that the Container Inspection Program is narrowly tailored and only minimally intrudes upon privacy interests. For one thing, passengers are given notice of the Program by, among other things, a prominently displayed sign and by public announcements. (See Monaghan Decl. ¶¶ 6, 8 & Ex. G; Garden Decl. ¶¶ 2-4.) See American-Arab Anti-Discrimination Comm., 2004 U.S. Dist. Lexis 14345, at *8-9 (notice "tends to reduce the subjective anxiety that MBTA riders might otherwise experience upon being asked to submit to the inspection of their bags if they had no reason to anticipate the inspection.") (citing Martinez-Fuerte, 428 U.S. at 558); Chenkin v. Bellevue Hosp. Ctr., 479 F. Supp. 207, 215 (S.D.N.Y. 1979). Second, inspections are conducted at openly viewable, fixed checkpoints relatively close to subway entrances by uniformed police officers. (See Powerpoint Presentation; Monaghan Decl. ¶ 10; Exhibit F.) See Martinez-Fuerte, 428 U.S. at 558-59 ("motorists can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion") (internal quotation omitted).[31] Subway passengers are randomly selected for bag search pursuant to a selection formula the ratio

---

[31] Defendants point out that any fear or surprise which may be felt by passengers may be assuaged by "[t]he public's awareness of the heightened threat of terrorism" to the subway system and "the prevalence of bag searches" to gain entrance to certain public places. (See Defs.' Mem. at 31 (citing testimony of Plaintiffs indicating that they are regularly subjected to security inspections at airports, government buildings, hospitals, and sporting events) .)

for which is determined by a supervisor based upon neutral factors.  (Finest Message at 1.)

Officers have little or no discretion in selecting individuals for inspection except to determine

whether a bag or container is large enough to contain an explosive device.  (Id.; Monaghan Decl.

¶ 8.)  See Brown v. Texas, 443 U.S. 47, 51 (1979) (Fourth Amendment requires that

suspicionless searches and seizures must be "carried out pursuant to a plan embodying explicit,

neutral limitations on the conduct of individual officers") (citing Prouse, 440 U.S. at 661

("standardless and unconstrained discretion is the evil the Court has discerned when in previous

cases it has insisted that the discretion of the official in the field be circumscribed, at least to

some extent")); Martinez-Fuerte, 428 U.S. at 559; American-Arab Anti-Discrimination Comm.,

2004 U.S. Dist. Lexis 14345, at *9 (finding intrusion mitigated where "plan cedes no discretion

to the officers conducting the inspections" so that "officers do not exercise any choice or

judgment about whose bags to inspect."); Chenkin, 479 F. Supp. at 215 (employees of municipal

hospital chosen at random for bag searches by guards at exit "not stigmatized by the suspicion of

wrongdoing").  Third, individuals may refuse inspection under the Program.[32]  (See Finest

Message at 2.)  See Edwards, 498 F.2d at 500-01 (holding airport searches reasonable because,

among other reasons, "the passenger has been given advance notice of his liability to such a

search so that he can avoid it by choosing not to travel by air"); United States v. Albarado, 495

F.2d 799, 807-8 & n.15 (2d Cir. 1974) (finding intrusion of airport searches mitigated by

"element of voluntariness")).  Fourth, the searches are limited in scope and duration.  The goal is

to determine whether a container contains an explosive device.  (See Finest Message at 2;

Powerpoint Presentation; Monaghan Decl. ¶ 10; Exhibit F.)  Officers are instructed to inspect

---

[32]  Or they may opt not to travel with (uninspected) containers.

those containers and areas of containers capable of containing an explosive device, not to look for contraband or to read written or printed material, and to open or manipulate the contents of bags themselves only "if necessary."  (See Powerpoint Presentation; Monaghan Decl. ¶ 8; Exhibit F.)  See Lifshitz, 369 F.3d at 192; Downing v. Kunzig, 454 F.2d 1230, 1232 (6th Cir. 1972) (upholding bag searches upon entry to federal building which were "cursory in nature and made for the strictly limited purpose of determining that no explosives or dangerous weapons were transported into the building.").  The inspections generally are brief (a matter of seconds not minutes).  (Finest Message at 2; Powerpoint Presentation; Monaghan Decl. ¶ 8; Exhibit F.)  See Lidster, 540 U.S. at 425 (fact that highway checkpoint stop to gather information was "likely brief" diminished intrusion); Downing, 454 F.2d at 1233 ("The only intrusion is a brief stop and a cursory examination of packages or briefcases to determine the possible existence of articles having a potential of danger."); see also Sitz, 496 U.S. at 448.[33]

---

[33]   That the NYPD may be experimenting with other means of detecting explosives in subways does not change the analysis.  See Sitz, 496 U.S. at 453-54 (the choice "among reasonable alternative law enforcement techniques" remains with the police); see also Earls, 536 U.S. at 837; Mollica, 229 F.3d at 370.

V.    **Conclusion and Order**

The Court finds that the governmental interest in preventing a terrorist bombing of New York City's subway system is vitally important, that the Container Inspection Program is effective in deterring such an attack, and the minimal intrusion entailed by subway searches is justified.  See, e.g., Earls, 536 U.S. at 829; Sitz, 496 U.S. at 455.

For the reasons set forth above, Plaintiffs' application for a declaratory judgment and a permanent injunction is denied.  See Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992); Old Republic Ins. Co. v. Hansa World Cargo Serv. Inc., 170 F.R.D. 361, 385 (S.D.N.Y. 1997).  The Complaint [1] is dismissed with prejudice, and the Clerk of the Court is respectfully directed to enter judgment in favor of the Defendants and to close this case.


Dated:  New York, New York
        December 7, 2005

*RMB*

_____
**RICHARD M. BERMAN, U.S.D.J.**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2/7/05_

-41-